## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| TIFFANY JOHNSON, individually and on behalf of all others similarly situated, | CASE NO.: |
| Plaintiff, | |
| v. | DEMAND FOR JURY TRIAL |
| GENERAL MOTORS LLC, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Tiffany Johnson ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, the "Class," as more fully defined below), files this Class Action Complaint ("Complaint") against Defendant General Motors LLC ("GM" or "Defendant"). The allegations herein are based upon Plaintiff's personal knowledge, and as to all other matters upon the investigation of counsel and upon information and belief where noted. In support thereof, Plaintiff states as follows:

### I.    INTRODUCTION

1.     This is a class action lawsuit brought by Plaintiff individually and on behalf of a proposed class of current and former owners and lessees of 2013-2022 Chevrolet Malibu vehicles equipped with 1.5L, 1.8L, 2.0L, 2.5L engines (the "Class

Vehicles")[1] designed, manufactured, distributed, and sold by Defendant containing a dangerous defect in the Class Vehicle's cam-driven brake vacuum pump that causes a loss of braking capability, increased stopping distances, and results in damage to the Class Vehicles' camshaft and other engine components (the "Brake Defect").

2.     When functioning normally, the brake pedal in the Class Vehicle is depressed and the brake system sends hydraulic fluid to all four wheels, compressing the brake calibers against the rotors and bringing the vehicle to a stop.

3.     The Class Vehicles use a brake booster to amplify brake pedal application. The brake boosters used in the Class Vehicles require a steady vacuum supply to increase the forces that the driver applies to the brake pedal.

4.     The Class Vehicles are equipped with a camshaft-driven vacuum pump that supplies the brake booster with the requisite vacuum. The mechanical vacuum pumps in Class Vehicles are mounted to, and driven by, the overhead exhaust camshaft.

5.     The Class Vehicles, however, suffer from a defect that causes vacuum pump failure, resulting in a hard brake pedal application, reduced braking capability and increased stopping distances. Moreover, because the vacuum pump is mounted

---

[1] Other GM vehicles may be equipped with the same or substantially similar vacuum pump, and Plaintiff's counsel is investigating whether additional GM-brand model vehicles and model years may be affected. Plaintiff reserves the right to amend or add vehicle models and model years to the definition of Class Vehicles.

on the camshaft, when the vacuum pump fails, unintended mechanical resistance forms, affecting the timing of and/or damaging the camshaft and other engine components.

6. Designing and manufacturing vehicles with safe and reliable braking systems is paramount to ensure the safety and wellbeing of drivers, passengers, and others on the road. However, the Brake Defect presents an unreasonable risk to occupants' safety and predisposes occupants to injury, accident, and death. The Brake Defect results in: (1) hard brake pedal application; (2) increased stopping distances; and (3) camshaft and other engine component damage.

7. Class members have complained to the National Highway Traffic Safety Administration ("NHTSA") about collisions caused by the Brake Defect endangering both occupant safety and the safety of other drivers. For example, the owner of a 2016 Chevrolet Malibu filed the following complaint with NHTSA:

> I WAS INVOLVED IN A COLLISON WITH ANOTHER VEHICLE. IMMEDIATLY AFTER THE COLLISION THE BRAKES ON MY VEHICLE FAILED. I HAD TO USE THE CURB AND BUSHES TO STOP MY VEHICLE AFTER TRAVELING APPROXIMATELY 300 YARDS FROM THE COLLISION SITE.[2]

8. Class members have also complained to NHTSA about engine damage because of vacuum pump failure. For example, the owner of a 2017 Chevrolet

---

[2] NHTSA ID: 11398719 (all typographical and syntactical errors are taken directly from the NHTSA complaints).

3

Malibu filed the following complaint with NHTSA:

> Component: Vacuum pump, booster which caused engine damage (cam shaft) Safety: Unable to stop which could cause a collision Confirmation: Chevrolet dealer confirmed the booster caused the vacuum pump to fail which also caused engine damage Inspection: GEICO is sending an inspector and Chevrolet also confirmed damage Warning Lights: No warning lights,[3]

9.      All Class Vehicles are equipped with the same or substantially similar overhead camshaft-driven vacuum pumps.

10.     The Brake Defect is present in Class Vehicles from the date of manufacture and is thus covered by GM's Limited Warranty.

11.     GM has taken no action to correct the root cause of the Brake Defect. When GM repairs vehicles presented with the Brake Defect, it removes and replaces defective parts with new, but equally defective, parts.

12.     GM knew of the Brake Defect and the safety risks it poses since, at the very least, 2016, based on the increase in Brake Defect complaints submitted to NHTSA by consumers, and the increase in warranty claims to GM. However, despite its exclusive knowledge, GM concealed and continues to actively conceal the Brake Defect, and its safety risks, from Plaintiff, the other Class members, and the consuming public.

---

[3] NHTSA ID: 11468218.

13.     Despite notice and knowledge of the Brake Defect from the numerous consumer complaints that it received, warranty claims and customer complaints submitted by dealers, pre-sale durability testing, NHTSA complaints, and its own internal records, GM has not addressed the underlying cause(s) of the Brake Defect, recalled the Class Vehicles to repair the Brake Defect, extended the warranty of Class Vehicles, offered its customers a suitable repair or replacement free of charge, reimbursed consumers who incurred out-of-pocket expenses to repair the Brake Defect, or compensated consumers for the diminished value caused by the Brake Defect.

14.     Moreover, despite its awareness of the Brake Defect and its duty to disclose it, GM continued to manufacture and sell Class Vehicles and market them as safe and reliable vehicles. GM did so despite knowing the Class Vehicles contained a serious safety defect that places Plaintiff and the other Class members (and others on the road in the vicinity of the Class Vehicles) at risk of serious bodily injury and death.

15.     Plaintiff and the other Class members purchased their Class Vehicles believing they would provide safe and dependable transportation. The Brake Defect renders the Class Vehicles unsafe and less valuable than consumers would reasonably expect.

16.     As a result of GM's unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of Class Vehicles, including Plaintiff and the other Class members, have suffered an ascertainable loss of money and/or property and/or loss in value.

17.     Had Plaintiff and other Class members known about the Brake Defect at the time of purchase or lease, they would not have purchased or leased the Class Vehicles or would have paid substantially less for them.

## II.     JURISDICTION AND VENUE

18.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff is a citizen of a different state than GM.

19.     The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs. Subject matter jurisdiction also arises under the Magnuson-Moss Warranty Act claim(s) asserted under 15 U.S.C. § 2301, et seq.

20.     This Court has personal jurisdiction over Plaintiff because she submits to the Court's personal jurisdiction. This Court has personal jurisdiction over GM because GM conducted and continues to conduct substantial business in this District;

6

its corporate headquarters is located in this District; and because it has committed the acts and omissions complained of herein in this District, including marketing, selling, and leasing Class Vehicles in this District.

21.     Venue as to GM is proper in this judicial district under 28 U.S.C § 1391 because Defendant sells a substantial number of automobiles in this District, has dealerships in this District, maintains its corporate headquarters within this District, and many of GM's acts complained of herein occurred within this District, including the marketing and leasing of the Class Vehicles to Plaintiff and other Class members in this District. Venue is proper pursuant to 18 U.S.C. § 1965(a) & (b) because Defendant transacts affairs in this District, and the ends of justice require it. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this judicial District for venue purposes.

### III.   PARTIES

#### A.   Plaintiff

22.     Plaintiff Tiffany Johnson is domiciled in Maryland and is a resident of Upper Marlboro, Maryland.

23.     Plaintiff owns a 2017 Chevrolet Malibu equipped with a defective camshaft-driven vacuum pump. Plaintiff purchased her new 2017 Chevrolet Malibu

on April 28, 2017, from Page Chevrolet in Alexandria, Virginia.[4] Plaintiff's Malibu's odometer currently shows approximately 93,000 miles.

24.    In September of 2021, at approximately 78,000 miles, Plaintiff's vehicle experienced brake failure when trying to stop at a red light on Route 4 in Upper Marlboro. Following the failure, Plaintiff contacted Holmes Automotive in Temple Hills, Maryland for diagnosis and repair. Holmes Automotive diagnosed camshaft-driven vacuum pump failure in Plaintiff's Malibu and installed a replacement. Plaintiff paid $118.09 out of pocket for the replacement vacuum pump.

---

[4] Since the purchase date of Plaintiff's Class Vehicle, Page Chevrolet is no longer in business. The dealership located at 6500 Little River Turnpike, Alexandria, VA 22312 is now called Rosenthal Chevrolet.



*Figure 1*[5]

---

[5] Figure 1 is an image of the defective camshaft-driven vacuum pump removed out of Plaintiff's Malibu in September 2021.



***Figure 2***[6]

25.     On November 17, 2021, with 83,878 miles on the odometer, Plaintiff's

Malibu once again experienced a hard brake pedal and increased stopping distance

while driving on Route 4 in Upper Marlboro. Plaintiff pulled her Malibu over at the

intersection of Route 4 and Suitland Parkway, and she called a towing service to take

the vehicle to Ourisman Chevrolet of Marlow Heights, Maryland. Ourisman

Chevrolet diagnosed vacuum pump failure in Plaintiff's 2017 Malibu. Ourisman

---

[6] Figure 2 is an image of the same defective camshaft-driven vacuum pump removed
from Plaintiff's Malibu in September 2021.

Chevrolet replaced the brake vacuum pump, brake booster vacuum pipe, valve cover gasket, and brake booster vacuum sensor. The repairs were covered under Plaintiff's Geico insurance policy, but Plaintiff had to pay a $250 deductible. Ourisman Chevrolet had the vehicle until November 23, 2021 but did not offer Plaintiff a rental vehicle.

26.    On June 7, 2022, at 92,989 miles, Plaintiff's Malibu's brake vacuum pump once again failed. At the time of brake failure, Plaintiff was driving on Baltimore-Washington ("BW") Parkway in Laurel, Maryland. Plaintiff was able to coast her vehicle off Exit 197 of BW Parkway and pull into a shopping center, where she called a tow service to take her vehicle back to Ourisman Chevrolet of Marlow Heights. Ourisman Chevrolet diagnosed repeated failure of the brake vacuum pump and brake booster, causing significant downstream damage to the exhaust camshaft. At the time of diagnosis, Ourisman Chevrolet conveyed to Plaintiff and her insurance carrier that her vehicle would need a full engine replacement. However, on June 15, 2022, Daniel Beavers of Ourisman denied that Plaintiff's Malibu needed an engine replacement. Subsequently, on June 16, 2022, Ourisman Chevrolet replaced the vacuum pump, exhaust camshaft, and gaskets. Plaintiff picked up her Chevrolet Malibu on June 18, 2022. Plaintiff was required to pay a $250 deductible for the repairs, while her insurance carrier covered the remaining balance.



*Figure 3[7]*

27.     During every brake failure incident, no instrument cluster malfunction lamps illuminated and no warning of imminent failure of the vehicles braking system occurred. Each brake failure incident has occurred in moderate to heavy highway traffic, increasing the risk of injury or death to Plaintiff.

28.     Prior to purchasing her 2017 Chevrolet Malibu, Plaintiff spoke with a sales representative at Page Chevrolet and reviewed Chevrolet's website for Chevrolet Malibu, and the Monroney sticker for the vehicle upon delivery. GM did

---

[7] Figure 3 is an image of the oil inlet screen and vein of the defective vacuum pump removed from Plaintiff's Malibu in June 2022.

not disclose the Brake Defect through any of these avenues. Plaintiff was not aware of and, could not have discovered, the Brake Defect absent full and truthful disclosure by GM.

29.     GM failed to disclose the Brake Defect to Plaintiff before she purchased her 2017 Chevrolet Malibu despite GM's exclusive knowledge of the Brake Defect, and Plaintiff, therefore, purchased her vehicle with the incorrect understanding that it would be a safe and reliable vehicle.

30.     Plaintiff purchased her 2017 Chevrolet Malibu because she believed it to be a safe and reliable vehicle. However, as a result of the Brake Defect, Plaintiff no longer feels safe driving in her Class Vehicle.

31.     Despite GM's exclusive knowledge, while touting the safety and dependability of the Class Vehicles, at no point did GM or its agents, dealers, or other representatives disclose to Plaintiff the Brake Defect.

32.     Plaintiff is concerned about the safety and dependability of her Class Vehicle due to the dangers resulting from the Brake Defect and believes its value is diminished as a result.

33.     Had GM disclosed the Brake Defect, Plaintiff would not have purchased her 2017 Chevrolet Malibu, or would have paid substantially less for it.

**B.     Defendant**

34.     General Motors, LLC ("GM"), is a Delaware limited liability company

organized and existing under the laws of the State of Delaware. GM's principal place of business and headquarters is located at 300 Renaissance Center, Detroit, Michigan, and GM is a citizen of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the state of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware corporation, with its principal place of business in the state of Michigan and is a citizen of Delaware and Michigan.

35.    GM, through its various entities, designs, tests, manufactures, markets, distributes, warrants, sells, and leases various automobiles under several prominent brand names, including Buick, GMC, Chevrolet, and Cadillac in this District, throughout the United States, and worldwide. GM designed, tested, manufactured, marketed, distributed, warranted, sold, and leased the Class Vehicles at issue in this case.

## IV.    FACTUAL ALLEGATIONS

36.    GM designs, manufactures, markets, and sells millions of vehicles worldwide under various brand names, such as Buick, Chevrolet, GMC, and Cadillac. GM reported $127 billion of revenue in 2021 alone.

14

37.     Upon information and belief, GM also owns ACDelco. Upon information belief, ACDelco, or its subsidiaries or partnerships, manufactured the vacuum pumps equipped in the Class Vehicles.

38.     GM designed, manufactured, marketed, and sold over 850,000 Class Vehicles nationwide, all of which are equipped with the same or substantially similar mechanical cam-driven vacuum pumps and experience the same or substantially similar failure modes.

**A.     The Brake Defect.**

42.     The brake boosters used in the Class Vehicles require a steady vacuum supply to amplify the forces applied by the driver to the brake pedal.  The vacuum is supplied by the mechanical vacuum pump.

43.     The mechanical vacuum pump is mounted to, and driven by, the overhead exhaust side camshaft.

44.     Within the mechanical vacuum pump is a vein that rotates with the camshaft. The mechanical vacuum pump and vein require oil lubrication.

45.     However, the Class Vehicles' vacuum pumps suffer from a defect that causes the vacuum pump to break down internally, creating a hard brake pedal and increased stopping distances. Moreover, because the vacuum pump is mounted to the camshaft, when the vacuum pump fails, mechanical resistance is created,

affecting the ignition timing and/or damaging the camshaft or other engine components (the "Brake Defect").

46.     The Brake Defect is caused by debris in the engine oil and/or oil sludge clogging the oil inlet screen on the vacuum pump. When the screen is clogged, oil cannot circulate and lubricate the pump and internal components, decreasing vacuum levels and/or causing vein breakage and/or seizure.

47.     GM acknowledged the existence of the Brake Defect in October 2018, when it issued a TSB advising technicians that "[i]f you find the vacuum pump drive lugs are broke and/or the exhaust camshaft reluctor is out of position, then replacement of the exhaust camshaft and vacuum pump will be required."[8]  The TSB's images reflect debris-ridden vacuum pumps with broken camshaft lugs caused by vacuum pump mechanical resistance.

---

[8] Exhibit A, GM Bulletin PIP5598.



*Figure 5[9]*

---

[9] *See* Exhibit A.



*Figure 6[10]*

48.    GM amended this TSB three times between December 2018 and August 2020.

49.    However, GM has not offered an improved part to correct the defect, nor has GM remedied the underlying cause of engine contamination/oil sludge. Rather than addressing the root cause of the Brake Defect, GM is inadequately treating the symptoms.

---

[10] *See* Exhibit A.

50.    Though GM has recalled other model vehicles for this failure mode and offered an improved replacement part, GM has not recalled the Class Vehicles. To date, GM has failed to offer a remedy for the defective mechanical vacuum pumps.

51.    GM knew or should have known that a defectively designed mechanical vacuum pump and the connected components could fail, thereby causing loss of braking operability, brake failure, and engine damage under normal use.

52.    The symptoms of the Brake Defect frequently present within the warranty period. However, Plaintiff and other Class members also have experienced the Brake Defect outside of warranty, thus incurring out-of-pocket costs.

53.    Plaintiff and the other Class members purchased or leased their Class Vehicles for the purpose of safely providing reliable transportation.

54.    A vehicle that lacks a reliably operational braking system puts its occupants at an ever-present risk of suffering serious bodily injury, including death. Moreover, as the customer complaints below make clear, the Brake Defect places others on the road at a substantially increased and ever-present risk to suffer serious bodily injury, including death.

55.    A vehicle without a safe, reliable, and operational braking system is unfit for its ordinary and intended purpose.

56.    Because GM manufactured the Class Vehicles without a safe, reliable, and operational vacuum pump, the Brake Defect renders the Class Vehicles unfit for

their ordinary and intended purpose.

57.    The Brake Defect substantially impairs the use, value, and safety of the Class Vehicles and renders the Class Vehicles substantially less drivable, less safe, and less useful.

58.    Additionally, GM does not advise owners and lessees of the Class Vehicles to refrain from driving their vehicles until a remedy can be implemented, nor has GM resolved the root cause. Thus, GM continues to place Plaintiff and the other Class Members at risk of serious bodily injury or death.

59.    GM violated its duty to disclose the Brake Defect.  Had GM disclosed the Brake Defect, Plaintiff and the other Class members would not have purchased or leased their vehicles or would have paid less for them.

60.    Moreover, GM has failed to offer Plaintiff and the other Class members adequate repairs, as each time GM may have warranted/repaired a Class Vehicle for brake failure due to the defective vacuum pump, a similarly defective part was installed.

**B.    GM Has Long Known About the Brake Defect, But Failed to Disclose It.**

62.    GM knew or should have known of the Brake Defect and its related safety risks well before Plaintiff and the other Class members purchased or leased their Class Vehicles. Pre-release evaluation and testing data, consumer complaints made directly to GM, NHTSA, and/or posted on public online vehicle owner forums,

GM's own investigations, TSBs, recalls of similar components in other vehicles, repair and replacement part sales data, and aggregate data from authorized-GM dealerships.

63.     Pre-release design, engineering, manufacture, and testing of Class Vehicles provided GM with comprehensive and exclusive knowledge about the Brake Defect, particularly the functions, uses, and the expected conditions the vacuum pump and engine may face, such as excessive engine contamination/oil sludge.

64.     In a July 2015 press release, GM announced the opening of a new 52-acre "Active Safety Test Area" at its Milford Proving Ground near Detroit, Michigan, where GM engineers would test GM's 2016 model year vehicles' twenty-two active safety technologies. Adequate testing of GM's safety technologies, including engine cleanliness and longevity and its braking systems, would have revealed the Brake Defect present in the Class Vehicles.

65.     GM knew or should have known of the Brake Defect from testing performed on the engines and vacuum pumps and related components. Vehicle manufacturers, like GM and its suppliers, perform various pre-production tests on new vehicle components including, but not limited to, Failure Modes and Effects

Analyses ("FMEA").[11]

66.    FMEA tests assess methods or modes by which a particular component might fail. It examines the materials used in each component, the assembly of the part, and whether use in various manners would cause the part to fail. For example, in testing the systems at issue here, FMEA testing would ask, among other things, how and under what conditions the systems and related components might fail, how likely failure was under different conditions, and how likely each condition tested was to occur. If properly performed, FMEA testing here would have revealed that (1) its engines were prone to contamination from debris/oil sludge, and (2) its cam-driven vacuum pumps were not capable of handling the levels of debris and oil sludge in GM's engines and would ultimately fail through normal operation of the Class Vehicles.

67.    GM and its suppliers performed these tests, and others, on the cam-driven vacuum pumps and other braking components in the Class Vehicles and, if performed with due care, each of these tests demonstrated that the relevant systems or components in the Class Vehicles would lead to failure.

68.    Moreover, GM has long known about contamination issues with its manufacturing plants, a source for engine oil debris clogging the oil inlet screen. For

---

[11] http://parsetraining.com/wp-content/uploads/2018/11/FMEA_Fourth-Edition.pdf (attached as Exhibit B).

example, in a July 2014 interview, William J. McAleer, a former GM quality auditor and head of GM's Global Delivery Survey Program from 1985 to 1998, told NBC that "[GM] began to find defects that would threaten the safety of the [vehicle] owners, and these were being shipped, apparently unknowingly, by our assembly plants to the public."[12] McAleer also wrote the GM Board of Directors in 2002 stating "GM has tolerated this intentional ignorance at the plant level . . . indicating either a failure or refusal to fully explore the problem in our manufacturing process. All to the complete detriment, and indeed, danger of our customers and others on the road."[13]

69. GM also knew that its engines, under normal operation, could create metal shavings and/or oil sludge. For example, in December of 2013, Car and Driver published an article regarding manufacturing errors and engine failures in 2013-2014 Chevrolet Malibu vehicles, among others, equipped with GM's naturally aspirated 2.5L four-cylinder and 2.0L turbo four engines. According to GM, the engines were equipped with defective connecting-rod bearings that disrupt the oil film between the bearing and crankshaft, causing catastrophic metal-on-metal contact.[14]

---

[12]https://www.nbcnews.com/storyline/gm-recall/willful-ignorance-ex-auditor-blasts-gm-cutting-safety-program-n152311 (attached as Exhibit C).

[13] *Id.*

[14]https://www.caranddriver.com/news/a15368085/maliboom-faulty-connecting-rod-bearing-causing-engine-failures-in-gm-four-cylinders/ (last visited June 28, 2022) (attached as Exhibit D).

Consequently, metal shavings are introduced into the oil supply, a potential source for engine debris. Car and Driver further explained that GM admitted the bad connecting-rod bearings "slipped past quality control".

70. Further, TSBs issued by GM over the years also reveal that it knew of quality issues with its engines, creating potential sources for engine debris, though GM often claims it is due to consumer error. For example, in July 2016, GM issued TSB 16-NA-222 related to internal engine damage in all "2017 and Prior" "GM Passenger Cars and Trucks." GM acknowledged that engine debris and oil sludge was common among its engines but blamed it on consumer maintenance, even though the TSB applied to brand-new vehicles. Moreover, GM ignores other causes of oil sludge not necessarily attributable to user maintenance, such as engine operating temperatures, coolant leaks, and clogged oil passages.

71. GM's pervasive engine contamination issues culminated in a recall of substantially similar mechanical vacuum pumps in GM-brand SUVs and Trucks on September 6, 2019. GM's recall included nearly 3.5 million GM-brand SUVs and trucks equipped with engine mounted, oil supplied, mechanical vacuum pumps that would fail when "[d]ebris such as oil sludge can accumulate on the filter screen, potentially restricting the flow of oil into the pump over time and gradually reducing

the amount of vacuum pressure generated."[15] Further stated, "[i]f the vacuum level drops, customers may experience increased brake pedal effort, hard brake pedal, and/or potentially increased stopping distance."[16]

72.    Though these vacuum pumps were equipped in different vehicles, GM was on notice that its engines were plagued by excessive debris/oil sludge and the vacuum pumps' oil inlet screens were not sufficiently robust.

73.    As stated above, GM issued a TSB in October of 2018 acknowledging the Brake Defect in the Class Vehicles. TSBs are not created overnight, but are a product of months (or years) of consumer complaints, warranty claims, and investigations, followed by months-long research, analysis, and testing.

74.    Moreover, GM monitors customer complaints submitted to NHTSA. Thus, GM knew or should have known of the risks associated with Brake Defect as evidenced by the numerous consumer complaints filed with NHTSA as early as 2016. *See* TREAD Act, Pub. L. No. 106- 414, 114 Stat. 1800 (2000).

75.    The following consumer complaints filed with NHTSA exemplify the seriousness of the Brake Defect. For example, on May 19, 2014, the owner of a 2014 Chevrolet Malibu filed the following complaint with NHTSA:

---

[15]    https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V645-8858.PDF    (last visited June 23, 2022) (attached as Exhibit E).

[16] *Id.*

TL* THE CONTACT LEASED A 2014 CHEVROLET MALIBU. WHILE DRIVING APPROXIMATELY 25 MPH, THE BRAKES FAILED AND THE CONTACT CRASHED INTO THE REAR OF ANOTHER VEHICLE. A POLICE REPORT WAS FILED. THE CONTACT SUSTAINED NECK AND BACK INJURIES WHICH REQUIRED MEDICAL ATTENTION. THE VEHICLE WAS NOT INCLUDED IN NHTSA CAMPAIGN NUMBER 14V252000 (SERVICE BRAKES, HYDRAULIC). THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 100.[17]

76.     On April 28, 2016, the owner of a 2013 Chevrolet Malibu filed the

following complaint with NHTSA:

TL* THE CONTACT OWNS A 2013 CHEVROLET MAILBU. WHILE DRIVING APPROXIMATELY 35 MPH, THE BRAKE PEDAL STIFFENED WITHOUT WARNING WHEN THE PEDAL WAS DEPRESSED. THE CONTACT PULLED OVER TO THE SIDE OF THE ROAD AND PUMPED THE BRAKE PEDAL UNTIL IT WORKED. THE DEALER DIAGNOSED THAT THE BRAKE BOOSTER FAILED AND NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED NINE MONTHS LATER. THE VEHICLE WAS TAKEN BACK TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE MASTER CYLINDER NEEDED TO BE REPLACED. THE CONTACT WAS INFORMED THAT THE VEHICLE WAS OUT OF WARRANTY. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND OFFERED A $70.00 REBATE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 63,000.[18]

---

[17] NHTSA ID 10592455. Plaintiff notes that Recall 14V252000 applies to prior generation Chevrolet Malibu vehicles and does not create a reduction in brake performance, rather it creates a malfunction indicator lamp warning.

[18] NHTSA ID 10949748

77. On December 3, 2016, the owner of a 2016 Chevrolet Malibu filed the following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2016 CHEVROLET MALIBU. WHILE DRIVING 25 MPH, THE BRAKE PEDAL TRAVELED TO THE FLOORBOARD WHEN IT WAS DEPRESSED. THE WHEELS LOCKED UP AND THE CONTACT'S VEHICLE SLID INTO THE REAR OF THE PRECEDING VEHICLE. THE AIR BAGS FAILED TO DEPLOY. A POLICE REPORT WAS FILED AND THERE WERE NO INJURIES. THE VEHICLE WAS TOWED TO AN INDEPENDENT REPAIR FACILITY FOR REPAIRS. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 4,100.[19]

78. On September 16, 2019, the owner of a 2016 Chevrolet Malibu filed the following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2016 CHEVROLET MALIBU. WHILE DRIVING APPROXIMATELY 60 MPH, THE BRAKE SYSTEM MALFUNCTIONED AND THE VEHICLE WOULD NOT IMMEDIATELY STOP. DURING THE FAILURE, THE BRAKE PEDAL COULD NOT BE DEPRESSED AND SEIZED. THE VEHICLE WAS TAKEN TO AUTONATION CHEVROLET GILBERT (3215 S. AUTO WAY, GILBERT, AZ) WHERE IT WAS DIAGNOSED THAT THE BRAKE VACUUM PUMP WAS FAULTY AND NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED. THE FAILURE MILEAGE WAS 100,000.[20]

79. On October 2, 2019, the owner of a 2016 Chevrolet Malibu filed the following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2016 CHEVROLET MALIBU. WHILE DRIVING 60 MPH, THE REDUCE POWER IN THE

---

[19] NHTSA ID: 10937278.

[20] NHTSA ID: 11255922.

ENGINE WARNING INDICATOR ILLUMINATED AND THE
VEHICLE GRADUALLY BEGAN TO LOSE POWER. THE
CONTACT PULLED OVER AND RESTARTED THE VEHICLE;
HOWEVER, THE VEHICLE WOULD NOT TRAVEL OVER 60
MPH. THE CONTACT ALSO STATED THAT THE BRAKES
FAILED WHILE APPROACHING A STOP LIGHT. WHILE
DEPRESSING THE BRAKE PEDAL, THE BRAKES FAILED TO
RESPOND IN A TIMELY MATTER. THE CONTACT TOOK THE
VEHICLE TO ALL AMERICAN CHEVROLET OF KILLEEN (1802
E CENTRAL TEXAS EXPY, KILLEEN, TX 76541, 254-213-5397)
WHERE IT WAS DIAGNOSED THAT THE BRAKE BOOSTER
AND VACUUM PUMP WERE DEFECTIVE AND THE BATTERY
WAS OVERCHARGED. THE CONTACT WAS INFORMED THAT
THE VEHICLE WAS INCLUDED IN NHTSA CAMPAIGN
NUMBERS: 16V521000 (HYBRID PROPULSION SYSTEM) AND
16V272000 (ELECTRONIC STABILITY CONTROL). THE
CONTACT WAS INFORMED BY THE DEALER THAT DUE TO
THE BUMPER TO BUMPER WARRANTY, A RECALL REPAIR
COULD NOT BE PERFORMED ON THE VEHICLE. THE
VEHICLE REMAINED IN THE POSSESSION OF THE DEALER.
THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE.
THE FAILURE MILEAGE WAS 71,493.[21]

80.     On June 17, 2017, the owner of a 2016 Chevrolet Malibu, filed the

following complaint with NHTSA:

TL* THE CONTACT OWNS A 2016 CHEVROLET MALIBU.
WHILE DRIVING APPROXIMATELY 25 MPH, THE BRAKE
PEDAL TRAVELED TO THE FLOORBOARD WHEN THE BRAKE
PEDAL WAS DEPRESSED. THE CONTACT HEARD A LOUD
GRINDING NOISE AND THE VEHICLE FAILED TO STOP. THE
CONTACT COASTED THE VEHICLE TO THE SIDE OF THE
ROAD, PUMPED THE BRAKE PEDAL FOR HALF AN HOUR,
AND WAS ABLE TO RESUME DRIVING. THE FAILURE
RECURRED TWICE. THE VEHICLE WAS TAKEN TO FAIRWAY
CHEVROLET (LOCATED ON 3100 E SAHARA AVE, LAS
VEGAS, NV) WHERE THE CONTACT WAS INFORMED THAT

---

[21] NHTSA ID: 11265632.

THE FAILURE COULD NOT BE DIAGNOSED OR DUPLICATED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 9,090.[22]

81. On June 30, 2017, the owner of a 2016 Chevrolet Malibu filed the following complaint with NHTSA:

TL* THE CONTACT OWNS A 2016 CHEVROLET MALIBU. WHILE APPROACHING A STOP, THE BRAKE PEDAL WAS APPLIED, BUT THE VEHICLE CONTINUED TO MOVE. THE CONTACT CALLED A LOCAL DEALER (MILLER BROTHERS OF ELLICOTT CITY LOCATED AT 9035 BALTIMORE NATIONAL PIKE, ELLICOTT CITY, MD 21042 410-988-6185). THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND REFERRED THE CONTACT TO NHTSA. THE FAILURE MILEAGE WAS 17,922. ..UPDATED 10/13/17 *BF THE CONSUMER STATED THE VEHICLE HAS AN AUTO STOP FEATURE ON IT FROM THE FACTORY. WHEN THE VEHICLE COMES TO A STOP, THE FEATURE CAUSES THE VEHICLE TO SHUT DOWN AND RESTART. THIS CAN BE VERY DANGEROUS IF STOPPING ON AN INCLINE, AS THE VEHICLE WOULD DRIFT BACKWARDS. UPDATED 10/17/2017*JS[23]

82. On August 30, 2018, the owner of a 2016 Chevrolet Malibu filed the following complaint with NHTSA:

TL* THE CONTACT OWNS A 2016 CHEVROLET MALIBU. WHILE DRIVING 40 MPH, THE CONTACT DEPRESSED THE BRAKE PEDAL, BUT THE VEHICLE FAILED TO STOP. AS A RESULT, THE CONTACT CRASHED INTO A MEDIAN. THERE WERE NO INJURIES AND A POLICE REPORT WAS NOT FILED. THE VEHICLE WAS TOWED TO THE CONTACT'S RESIDENCE. THE CONTACT CALLED CARLISLE CHEVROLET BUICK GMC

---

[22] NHTSA ID: 10992866.

[23] NHTSA ID: 11002503.

CADILLAC AT (972) 938-8000 (LOCATED AT 1701 US-287 BYP, WAXAHACHIE, TX 75165) AND WAS INFORMED TO SCHEDULE AN APPOINTMENT. THE CONTACT STATED THAT A DIAGNOSTIC TEST WAS COMPLETED AT HER RESIDENCE BY A FAMILY MECHANIC WHO DETERMINED THAT THE BRAKE ROTOR SENSOR NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 54,000. THE VIN WAS NOT AVAILABLE.[24]

83.    On January 8, 2019, the owner of a 2016 Chevrolet Malibu filed the following complaint with NHTSA:

ON 1/4/2018 I WAS DRIVING ON I-95 AND THE CAR BRAKES SUDENLY STOP WORKING COMPLETELY.[25]

84.    On April 30, 2020, the owner of a 2016 Chevrolet Malibu filed the following complaint with NHTSA:

PRESSING ON BREAK LOST BREAKING POWER. WAS TOLD BY MY MECHANIC BREAK VACUUM PUMP HAD ISSUE. HE SPECIFICALLY MENTIONED THE ISSUE HE FOUND DOCUMENTED.[26]

85.    On August 25, 2021, the owner of a 2016 Chevrolet Malibu filed the following complaint with NHTSA:

Second issue with brakes on 2016 Chevy Malibu. First issue fixed in September 2020 by replacing vacuum pump and sensor. The pump failed and pieces of the pump break off and fall into the engine. The exact same issue happened again June 2021. The brakes are very hard

---

[24] NHTSA ID: 11123511.

[25] NHTSA ID: 11165152.

[26] NHTSA ID: 11414623.

and a loud thumping noise was coming from under the hood when you pressed the brakes. It was very hard to stop the car. I knew it was the same issue from September 2020. The vacuum pump was removed and returned to the dealership where I purchased it from in September 2020 when the original part failed. The part I returned in June 2021 was still under warranty. When I returned it and told them it failed the exact same way in 2020, the man in parts said "They PROBABLY won't warranty the part again since it failed twice. So there's probably something else wrong with your car" REALLY!!! I did notice that the part had been redesigned and the part that breaks off in the engine is no longer there. This proves Chevrolet knows this is an issue, but refuses to recall these vehicles. Thankfully I was on a country road, not driving fast when it failed this time. We live at the bottom of 2 hills, so I had to drive partially in the ditch to help the car slow down enough to safely pull into my driveway with no brakes.[27]

86.    On November 27, 2019, the owner of a 2017 Chevrolet Malibu filed

the following complaint with NHTSA:

TL* THE CONTACT OWNS A 2017 CHEVROLET MALIBU. THE CONTACT STATED THAT THE VEHICLE WOULD SHUT OFF WHILE DRIVING VARIOUS SPEEDS AND THE ENGINE POWER REDUCED WARNING INDICATOR ILLUMINATED SIMULTANEOUSLY. THE CONTACT HAD THE VEHICLE TOWED TO AN INDEPENDENT MECHANIC WHO INFORMED HER THE FAILURE WAS DUE TO THE CAMSHAFT VACUUM PUMP. THE CONTACT CALLED VAN CHEVROLET (100 NW VIVION RD, KANSAS CITY, MO 64118, (816) 527-8564), BUT NO ASSISTANCE WAS OFFERED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 65,000.[28]

---

[27] NHTSA ID: 11430562 (capitalization, or lack thereof, is as it appears in the original NHTSA complaints).

[28] NHTSA ID: 11282718.

87. On July 10, 2020, the owner of a 2017 Chevrolet Malibu filed the following complaint with NHTSA:

> COMING HOME FROM FLORIDA TO ATHENS ALABAMA WE STOPPED AT A REST STOP AND I NOTICED MY BRAKES WAS REALLY HARD TO PUSH AND MADE A AWFUL NOISE. WE LOOKED AT THE BRAKES AND THOUGHT THE PADS WAS BAD. I MANAGED TO GET IT HOME LUCKILY ON MAJOR TRAFFIC JAMS ON INTERSTATE 65. MY HUSBAND PUT A CODE READER AND IT SAID BRAKE BOOSTER SENSOR BUT MY HUSBAND PULLED THE LINE FROM THE VACUUM PUMP AND THE VACUUM PUMP WASN'T PULLING.THANK GOD WE MADE IT HOME. FROM WHAT I'VE READ ON THIS WEBSITE A RECALL SHOULD BE DONE. CAR IS NOW PARKED IN GARAGE WHAT TIL CHEVY DEALERSHIP OPENS ON MONDAY!!![29]

88. On August 4, 2020, the owner of a 2017 Chevrolet Malibu filed the following complaint with NHTSA:

> DRIVING AND MY CAR WOULDN'T STOP BECAUSE MY STABLITRAK AND ABS SYSTEM MALFUNCTION AND NOW THE DEALER IS SAYING I NEED A VACUUM PUMP AND THROTTLE CHANGE. THIS IS A KNOW ISSUES IN THE GM CARS JUST SEEN ON GOOGLE THAT A GLOBAL LETTER WAS SENT OUT AUG OF 2019 ABOUT THIS ISSUES BUT I NEVER RECEIVED IT. THESE CARS SHOULD BE RECALLED AND WE SHOULD BE GIVEN OUR MONEY BACK. I HAVE 2017 CHEVY MALIBU AND I FEEL THIS PREMEDITATED MURDER BECAUSE THEY KNOW IT'S A ISSUE AND I COULD HAVE LOST MY LIFE JULY 30 2020 AT 959PM[30]

---

[29] NHTSA ID: 11338710.

[30] NHTSA ID: 11343119.

89.    ON August 20, 2020, the owner of a 2017 Chevrolet Malibu filed the

following complaint with NHTSA:

> I WAS DRIVING AT 70 MPH ON A HIGHWAY AND THE CAR
> SHUT OF CAUSING ME TO NEARLY GET HIT MULTIPLE
> TIMES. I WAS BARELY ABLE TO GET THE CAR TO THE OFF
> RAMP I WAS APPROACHING. I HAD THE CAR TOWED 100
> MILES TO MY HOUSE AND THEN TO A DEALERSHIP. THE
> DEALERSHIP DETERMINED THAT THE VACUUM PUMP
> CAME APART AND SENT METAL EVERYWHERE. THE
> VACUUM COMING APART ALSO CAUSED THE CAMSHAFT
> TO BREAK ALONG WITH A HOSE AND A CAMSHAFT SENSOR.
> THE REPAIRS ALONE ARE ESTIMATED SO FAR TO COST ME
> ABOUT $2,500.[31]

90.    On September 9, 2020, the owner of a 2017 Chevrolet Malibu filed the

following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2016 CHEVROLET MALIBU. THE
> CONTACT STATED WHILE DRIVING 70 MPH, THE ENGINE
> POWER REDUCED WARNING LIGHT ILLUMINATED WITH
> THE ACCELERATOR PEDAL DEPRESSED. THE VEHICLE
> STARTED TO DECELERATE. THE CONTACT COASTED THE
> VEHICLE TO THE SHOULDER OF THE ROADWAY, TURNED
> THE VEHICLE OFF AND BACK ON WHICH RESUME BACK TO
> NORMAL OPERATION. THE CONTACT ASLO MENTIONED
> THAT WHILE THE BRAKE PEDAL WAS DEPRESSED, THE
> VEHICLE HESITATED AND JERKED FORWARD. THE VEHICLE
> WAS TAKEN TO FRIENDLY CHEVROLET (7501 HIGHWAY 65
> NE, FRIDLEY, MN 55432) WHERE IT WAS DIAGNOSED AND IT
> WAS DETERMINED THAT THE VACUUM PUMP AND
> ACCELERATOR PEDAL ASSEMBLY NEEDED TO BE
> REPLACED. THE ACCELERATOR PEDAL ASSEMBLY WAS
> REPAIRED HOWEVER, THE VACUUM PUMP WAS NOT. THE
> FAILURE RECURRED WITH THE BRAKE PEDAL. THE
> MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE

---

[31] NHTSA ID: 11350525.

CONTACT WAS INFORMED THAT THE VIN WAS NOT SUBJECTED TO A RECALL. THE FAILURE MILEAGE WAS APPROXIMATELY 50,000.[32]

91.     On November 23, 2020, the owner of a 2017 Chevrolet Malibu filed

the following complaint with NHTSA:

THE BRAKE VACUUM PUMP IS BAD THEY USED TO CHEAP CHINESE KNOCKOFF PART THAT BREAKS AND GET SUCKED INTO THE ENGINE POSSIBLY CAUSING ENGINE FAILURE BUT FOR THE MOST PART IN YOUR BRAKES CAN FAIL LEAVING THE CAR WITHOUT ANY BREAKING SUPPORT FROM THE BOOSTER VACUUM I CALLED THE DEALERSHIP THE SERVICE ADVISOR IMMEDIATELY TOLD ME TO TAKE THE CAR TO THE DEALER FOR WORK AT GENERAL MOTORS EXPENSE THE BRAKE VACUUM PUMPS ARE FAILING AT AN ALARMING RATE CAUSING SERIOUS DAMAGE AND POSSIBILITY OF INJURY 5 MINUTES AFTER I DID EVERYTHING THEY TOLD ME I RECALLED THE DEALING TO CONFIRM MY APPOINTMENT THEY REFUSED TO ANSWER THE PHONE AND PUT ME ON HOLD THEN WHEN THEY ANSWER THE PHONE THEY TOLD ME THAT THE SERVANTS ADVISOR I TALKED TO NO LONGER WORKS THERE BEST CHEVROLET KENNER LOUISIANA 70062 WITHOUT THE VACUUM PUMP THE BRAKES ARE VERY HARD THE PRESS THE CAR IS VERY DIFFICULT TO STOP ESPECIALLY AT HIGH SPEEDS I'M TRYING TO GET THIS FIXED BUT GENERAL MOTORS IS REFUSING THE SERVICE ADVISOR TOLD ME THE BEST THING THAT I CAN DO IS TO PAY FOR EVERYTHING AND WHENEVER GENERAL MOTORS FEELS LIKE DOING A RECALL I MAYBE CAN GET REIMBURSED[33]

92.     On January 31, 2021, the owner of a 2017 Chevrolet Malibu filed the

following complaint with NHTSA:

---

[32] NHTSA ID: 11353945.

[33] NHTSA ID: 11375852.

II BOUGHT MY 2017 CHEVROLET MALIBU LS IN AUGUST OF 2017, IN JANUARY OF 2018 MY FIRST ENGINE LIGHT WARNING CAME ON WITH MESSAGE "SHIFT TO PARK" CAME ON WHEN THE CAR WAS ALREADY IN PARK. I MOVED TO DENVER, CO IN JUNE OF 2018 , DURING MY LONG WHILE DRIVING THROUGH THE ROCKIES THE CHECK ENGINE LIGHT CAME ON SHOWING "STABILITY TRACK ISSUES. IN NOVEMBER 2018 WHILE MY FAMILY WAS DRIVING HOME IN A SNOW STORM YET ANOTHER ENGINE LIGHT SHOWING "ENGINE POWEWR REDUCED" THE CAR WENT FROM A 45 MPH DRIVE ON THE FREEWAY BECAUSE OF HEAVY SNOW TO ALMOST 20 MPH TOO SLOW FOR FREEWAY SPEEDS EVEN IN SNOW. I TOOK IT TO THE CHEVY DEALERSHIP THEY SAID IT WAS A DIRTY SPEED SENSOR. WHILE DRIVING ON THE HIGHWAY AT 70 MPH I WAS REACHING THE END OF THE FREEWAY WHEN THE CAR COMPLETELY SHUT OFF, I REACTED BY HITTING MY BRAKES BUT THE PEDAL WAS HARD AS A ROCK, I LOOKED UP AND I WAS FASTLY APPROACHING AN INTERSECTION SO I USED THE EMERGENCY BRAKE GOT ON THE RIIGHT DIRT SHOULDER, AND WAS ABLE TO SLOW IT DOWN TO ABOUT 35 MPH BEFORE REACHING THE INTERSECTION WHERE I TOOK A SHARP RIGHT TURN TO AVOID HITIING CARS IN FRONT OF ME AND SPUN OUT. THE CAR ISHOWED A MESSAGE "NO REMOTE DETECTED: IT WOULD CRANK BUT NOT START . BEING THAT THE CAR WARRENTY WAS ALREADY EXPIRED I HAD IT TOWED TO A LOCAL MECHANICS SHOP WHERE THEY DISCOVERED A CODE READING "BRAKE BOOSTER SENSOR" THEY DISCOVERED A SHATTERED VACUUM PUMP. I GOT IT REPLACED WITH A NEW ONE AS WELL AS THE BRAKE SENSOR. I STILL HAVEN'T BEEN ABLE TO START IT. BECAUSE OF COVID-19 AND MY FINANCIAL SITUATION I HAVE NOT TAKEN IT TO A DEALERSHIP. I AM SAVING TO HAVE IT TOWED THERE AND HOPEFULLY REPAIRING IT BUT I'M SURE IT'S NOT GOING TO BE WALLET FRIENDLY. WE WERE EXCITED WHEN WE BOUGHT OUR FIRST NEW CAR IT DIDN'T LAST LONG. NOW HOPEFULLY A RECALL AND SOME JUSTICE FOR US HARD WORKING PEOPLE THAT WANT

ONLY A RELIABLE CAR WITH NO HIDDEN REPAIR SURPRISES.[34]

93.    On May 11, 2021, the owner of a 2017 Chevrolet Malibu filed the following complaint with NHTSA:

> THIS IS MY SECOND COMPLAINT AND POSSIBLY THE LAST, IN MY FIRST COMPLAINT I REPORTED THE PROBLEM WITH THE CAR AFTER SHOWING A STABILITY TRACK WARNING LIGHT THEN SLOWING TO A 20 MPH VELOCITY IN A SNOW STORM , THEN MY ADVENTURE WITH THE VACUUM PUMP SHATTERING , THUS NO VACUUM, NO BRAKES, ON THE HIGHWAY GOING 70 MPH. AFTER THAT SCARE , IT HAD A CRANK NO START PROBLEM. THAT'S WHERE I ENDED MY FIRST COMPLAINT . PART 2, I COLLECTED MY STIMULUS MONEY AND HAD MY 2017 CHEVY MALIBU LS TOWED TO A CHEVY DEALERSHIP. AFTER THE SERVICE MANAGER ASKED ME FOR THE SPARE FOB, I ASKED HIM COULD THAT BE THE PROBLEM THE BATTERIES WENT LOW AND THE FOB KEYS HAD TO BE RE-PROGRAMED. HE STATED PROBABLY, I WENT HOME HOPING IT WOULD BE SOMETHING MINOR. 3 WEEKS LATER I GET A CALL FROM THE SERVICE MANAGER THAT HE WANTED TO GO THROUGH THE DIAGNOSTIC INSPECTION RESULTS WITH ME, I ASK HIM WAS IT SOMETHING MINOR, HE SAID WE HAVEN'T BEEN ABLE TO WORK ON THE CRANK, NO START PROBLEM CAUSE YOU HAVE LOW COMPRESSION ON ONE OF YOU ENGINE CYLINDERS YOU NEED A NEW ENGINE, THAT'S NOT MINOR 72,365 MILES, NEW ENGINE, ESTIMATE $8,224.80. STILL PAYING THE BANK FOR IT..THIS GENERATION MALIBU'S ARE NOT EVEN CLOSE TO GOOD. I OWN A 1994 CHEVROLET SILVERADO WITH 135,000 MILES BOUGHT IT BRAND NEW, RUNS GREAT, THE COST CUTTING IS BEING SACRIFICED FOR QUALITY, AND US CONSUMERS ARE GETTING THE LOW END.[35]

---

[34] NHTSA ID: 11390833.

[35] NHTSA ID: 11416053.

94.     On June 22, 2021, the owner of a 2017 Chevrolet Malibu filed the

following complaint with NHTSA:

> Brak Vacuum pump broke when on freeway making pedal very hard to
> push I am 200 hundred pounds and took alot to get the car to stop
> warning light did not come on tell I pumped the brakes …took pump
> off to find something that looked like Carbon build-up in the oil Screen
> on the pump took pump apart to find the inside Is broken in many places
> and the out side gear or shaft broken too I do[36]

95.     On September 19, 2021, the owner of a 2017 Chevrolet Malibu filed

the following complaint with NHTSA:

> While pulling into a parking lot, the brake pedal failed to push down,
> making me to have to exert force on the brake pedal to stop the car. I
> had been hearing a "grinding" sound but thought it was from the brake
> pads needing to be replaced and this was incident was from the calipers
> being over extended. After replacing the brake pads with the new ones
> (the old ones were only half the size of the new ones and did not need
> replacing) the brake pedal still did not push easily. I took the vehicle to
> the repair shop I always use and they affirmed there was a problem and
> gave the price for the parts (908.37 for the brake vacuum pump and
> 107.98 for the Brake Fluid Exchange with ABS). There is visible
> damage to the end of the camshaft from the pump freezing and being
> torn apart by the camshaft as a result. The total cost of the repairs was
> $3409.96, which was unexpected. I was quoted $1134 and change
> originally for parts and labor at the beginning of the problem being
> addressed.[37]

96.     On April 30, 2022, the owner of a 2017 Chevrolet Malibu filed the

following complaint with NHTSA:

---

[36] NHTSA ID: 11421773.

[37] NHTSA ID: 11433496.

Breaks suddenly failed I have researched this problem and it is a ongoing problem with the vacuum pump and Chevy knows this[38]

97.    On April 13, 2019, the owner of a 2018 Chevrolet Malibu filed the

following complaint with NHTSA:

I WAS RECENTLY GETTING ON THE HIGHWAY IN MY 2018 MALIBU AND HAD ABSOLUTELY NOOOO ENGINE POWER FOR ACCELERATION! LUCKILY I WAS ABLE TO GET ONTO THE MEDIAN BEFORE I WAS REAR ENDED BY THE FAST MOVING CARS! SIMULTANEOUSLY THE 'ENGINE POWER REDUCED', 'SERVICE TRACTION CONTROL', AND 'THE 'TRANSMISSION' SERVICE LIGHTS CAME ON! THEN AS I WAS GETTING OFF THE HIGHWAY AT THE NEXT EXIT, I WENT TO STOP AT THE LIGHT AND I HAD NOOOO BRAKES! LUCKILY I PUSHED AS HARD AS POSSIBLE AND GOT MY CAR TO STOP WITHOUT A SECOND TO SPARE! I HAVE NO DOUBT THAT 99% OF DRIVERS WOULD HAVE EITHER BEEN SERIOUSLY INJURED, OR SERIOUSLY INJURED SOMEONE ELSE IN THE PROCESS OF CRASHING THEIR CAR! I HAVE A PRETTY GOOD KNOWLEDGE OF CARS , FROM RACING MULTIPLE C5 AND C6 CORVETTES, BUT THIS PROBLEM HAD ME STUMPED FOR A WHILE. I TOOK THE MALIBU TO MULTIPLE GM SERVICE DEPARTMENTS, AND NONE OF THE MECHANICS COULD COME UP WITH A REASON WHY ALL THOSE SYSTEMS FAILED SIMULTANEOUSLY, AND MULTIPLE MECHANICS ALL SAID IT WAS EITHER THE BRAKE BOOSTER OR THE MASTER CYLINDER. I JUST DIDN'T SEE EITHER OF THOSE PARTS BEING THE REASON FOR THAT MUCH OF AN EFFECT ON THE CAR, AND LUCKILY I REMEMBERED THAT GM TRUCKS WERE HAVING A MAJOR ISSUE LOSING BRAKES DUE TO THE VACUUM PUMP. SO AFTER AN INSPECTION I FELT PRETTY CONFIDENT THAT WAS MY BRAND NEW MALIBU'S PROBLEM, SO I WENT TO THE PARTS COUNTER AND DROPPED $330 ON MY WARRANTIED MALIBU, AND SURE ENOUGH THE CAR WAS FINE AFTER THAT! HOWEVER, A MAJOR CONCERN OF MINE IS THAT THE OE VACUUM

---

[38] NHTSA ID: 11462847.

PUMP WAS MISSING CHUNKS OF METAL, AND CLEARLY THOSE CHUNKS OF METAL ARE FLOATING AROUND IN MY ENGINE! SO DESPITE MY REGULAR MAINTENANCE, AND EVEN EXTRA MAINTENANCE, MY CONFIDENCE IS NOT VERY HIGH, AND I'M CONSTANTLY WAITING FOR THE CAR TO HAVE ANOTHER PROBLEM WITH THE NEW VACUUM PUMP, ENGINE OR BRAKES![39]

98.    On August 14, 2021, the owner of a 2018 Chevrolet Malibu filed the

following complaint with NHTSA:

I was driving on the highway when my vacuum pump went out. Lucky I know how to handle a brake less situation. This should have never happened especially with a 2018 chevy malibu. We need a recall on all 2018 vacuum pumps. This will probly happen to more people if you dont.[40]

99.    On December 8, 2021, the owner of a 2018 Chevrolet Malibu filed the

following complaint with NHTSA:

Check in light is on. They told me it was something with the idle sensor the fixed it. Not even 24 hours later it's back on they tell me it the vacuum pump & it cost 800 buck. I do some research and noticed on not the only driver with this problem They tell me I can still drive it but nobody told me pieces of the pump could damage the engine also so what do I do now[41]

100.    On June 2, 2020, the owner of a 2019 Chevrolet Malibu filed the

following complaint with NHTSA:

I WAS STATIONARY AT A RED LIGHT ON HIGHWAY 49 WITH MY FOOT ON THE BREAKS, AND WHEN THE LIGHT TURNED

---

[39] NHTSA ID: 11195969.

[40] NHTSA ID: 11429134.

[41] NHTSA ID: 11443127.

GREEN I LET MY FOOT UP OFF THE BREAKS AND THE CAR JUST SHUT OFF. I TRIED TO TURN THE CAR BACK ON, BUT STILL NOTHING. I WAITED A FEW SECONDS AND THE CAR STARTED BACK UP, SO I PUT IT IN DRIVE AND STARTED DRIVING, BUT WHEN I TRIED TO SLOW DOWN THE BREAKS WERE VERY TIGHT. FOR AN HOUR AND A HALF, I SAT THERE AND TRIED TO FIGURE OUT WHAT WAS WRONG WITH THE CAR. I FOUND NOTHING, SO I GOT BACK INTO THE CAR AND CRANKED IT AND THE CHECK ENGINE LIGHT CAME ON. I GOT THE CAR TO STAR CHEVROLET AND THEY DIAGNOSED THE PROBLEM AS THE BRAKE VACUUM PUMP. *TR[42]

101. Like Plaintiff, owners and lessees of Class Vehicles have also experienced repeat failures of the vacuum pump. For example, on August 1, 2019, the owner of a 2016 Chevrolet Malibu filed the following complaint with NHTSA:

IN DECEMBER OF 2018 ON A ROAD TRIP, MY BRAKES FAILED; I LITERALLY HAD TO SLAM ON THE BRAKES TO GET THE CAR TO STOP. THIS HAPPENED ON THE PENNSYLVANIA TURNPIKE, WITH MYSELF, MY MOTHER AND MY 5 YEAR OLD DAUGHTER IN THE CAR. YOU CAN IMAGINE THE FEAR I FELT AT THAT TIME. THANKFULLY, I WAS ABLE TO MERGE ONTO THE SHOULDER OF THE ROAD AND WAIT FOR A TOW TRUCK. MY CAR WAS TAKEN TO A CHEVROLET DEALERSHIP IN HARRISBURG, PA AND IT TOOK THEM A WEEK TO REPLACE THE VACUUM PUMP. JULY 2019 I NOTICE THAT MY ENGINE LIGHT IS ON AND THERE IS A MESSAGE ON MY DASHBOARD THAT STATES 'REDUCED ENGINE POWER.' I IMMEDIATELY MADE AN APPOINTMENT FOR SERVICE AT THE DEALERSHIP THAT I INITIALLY PURCHASED THE CAR FROM. MY CAR HAS BEEN THERE SINCE TUESDAY, JULY 23, 2019 AND THEY TELL ME THAT THE 'ANTI-LOCK BRAKE' SYSTEM HAS FAILED AND THEY ARE STILL TRYING TO PINPOINT WHY THE ENGINE LIGHT IS ON. THE DEALERSHIP SUGGESTED THAT WE TAKE THE CAR HOME AND BRING IT ON ANOTHER DAY, BUT AGAIN,

---

[42] NHTSA ID: 11327026.

LEAVING THE DEALERSHIP, THE BRAKE PEDAL BECAME STIFF AND WE COULD NOT APPLY PRESSURE TO IT! THEY HAVE SINCE REPLACED THE VACUUM PUMP AGAIN.[43]

102.   Similarly, on February 15, 2022, the owner of a 2018 Chevrolet Malibu filed the following complaint on NHTSA:

> The vacuum pump on my vehicle has gone out for the 3rd time in 2.5 years. This creates a safety issue as that the brakes stop working and it takes an extreme amount of pressure for the car to stop. This has occurred once on the freeway and twice in heavy traffic areas. This could cause an accident and potentially seriously hurt or kill someone. This has occurred once before the engine was replaced and twice since it's been replaced.[44]

103.   These complaints represent a sampling of numerous complaints posted on NHTSA's website and other sources. In fact, numerous other consumers have reported similar incidents of vehicle failure on NHTSA and other public vehicle-owner forums.

104.   GM also knew about the Brake Defect from its warranty data. Per the TREAD Act, GM tracks vehicle diagnoses and repairs from dealership technicians in a single, aggregated database.[45] GM employs people who monitor the database for repair trends, and engineering and management staff review such trends in

---

[43] NHTSA ID: 11241016.

[44] NHTSA ID: 11452088.

[45] https://www.autosafety.org/wp-content/uploads/import/TREAD%20Fact%20Sheet%2011.24.14.pdf (attached as Exhibit F).

regular meeting. For every one complaint filed with NHTSA, GM likely receives hundreds or thousands of related warranty claims.[46] Accordingly, GM likely received hundreds or thousands of the Brake Defect warranty claims starting in 2016, before Plaintiff purchased her Class Vehicle in 2017. GM did receive Brake Defect warranty claims, which led to its October 2018 TSB.

105.   The Brake Defect substantially impairs the use, value, and safety of the Class Vehicles and renders them substantially less drivable, safe, useful, and valuable.

106.   As a result of the Brake Defect, all Class Vehicles are unfit for the purpose of providing safe and reliable transportation.

107.   Despite GM's knowledge of the serious safety risks the Brake Defect causes in the Class Vehicles, it has not disclosed Brake Defect or provided an adequate repair.

**C.   GM Omitted and Concealed the Brake Defect and Marketed the Class Vehicles Safe Hybrid Vehicles.**

112.   GM knowingly marketed and sold/leased the Class Vehicles with the Brake Defect, while willfully omitting and concealing the true inferior quality and

---

[46] *See, e.g.*,  https://static.nhtsa.gov/odi/inv/2007/INRL-EA07019-29683.pdf (over 48,000 warranty claims, 13 NHTSA complaints, 68 field reports) (attached as Exhibit G); *https://www.reuters.com/article/autos-ford-defect/u-s-nhtsa-probes-725000-ford-vehicles-for-engine-flaw-idUSL1N0BP51Y20130225* (123 NHTSA complaints, 27,505 warranty claims) (attached as Exhibit H).

substandard safety and performance of the Class Vehicles.

113.   GM directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media, which impart a uniform and pervasive marketing message.

114.   Despite GM's exclusive knowledge of the Brake Defect, GM violated its duty to disclose the Brake Defect and the safety risks it poses to Plaintiff and the general public, all while touting the safety, reliability, and efficiency of the Class Vehicles.

115.   Like Plaintiff, Class members and other consumers were drawn in by GM's pervasive marketing message of safety, reliability, power, and efficiency of the Class Vehicles.

116.   GM markets their vehicles using terms such as "longevity" and "long-lasting" to describe their engines and brakes, along with telling consumers they are "serious about safety."

117.   For example, in the 2013-2016 Chevrolet Malibu sales brochures, GM promoted the "exhilirati[ng]" power and efficiency of the 4-cylinder turbocharged

2.0L engine featuring dual overhead camshafts, all while failing to disclose the Brake Defect.[47]

118.   Similarly, in the 2013-2016 Chevrolet Malibu sales brochures, GM stated that their vehicles have "long-lasting stopping power" and an "integrated brake system [] designed to help you maintain control . . . and assists with stopping and decreasing vehicle speeds."[48] However, GM did not disclose the Brake Defect.

**LONG-LASTING STOPPING POWER.**
Innovative Duralife™ brake rotors have been hardened with a special patented process, resulting in rotors that can last up to twice as long as conventional rotors. The integrated brake system is designed to help you maintain control by preventing wheel lockup and assists with stopping or decreasing vehicle speed. This is the quiet strength of excellence.

119.   GM also marketed their vehicles as "exceptional in every aspect", all while failing to disclose the Brake Defect. For example, in the 2017 Chevrolet Malibu sales brochure, GM stated to "expect outstanding fuel efficiency . . . [a]nd

---

[47] *See* Exhibits I-L.

[48] *Id.*

peace of mind from the available advanced safety technologies that help prevent and protect you from a potential collision."[49]



120.  Similarly, in the 2018 Chevrolet Malibu sales brochure, GM touted "increased longevity" of its brakes and a "4-channel ABS for straighter, more controlled braking."[50]

121.  GM also touted that safety is a top priority for them and that, when it comes to safety, being "overprotective is a myth," all while failing to disclose the Brake Defect.[51]

---

[49] *See* Exhibit M.

[50] Exhibit N.

[51]*Id.*

**"OVERPROTECTIVE" IS A MYTH.** Side Blind Zone Alert, Rear Cross Traffic Alert and Front Park Assist are among the many active safety features available on the all-new 2016 Malibu that use radar- and camera-based technologies to help you stay ever vigilant of your surroundings.

122.   GM claims that they are "serious about safety" in their 2016-2019 Chevrolet Malibu sales brochures, and even boasts about various automatic braking systems that are designed to help keep the occupants of the vehicle safe, all while failing to disclose that the brakes in the vehicle could fail and prove to be the cause of serious injury.[52]

---

[52] Exhibits L - O.

## WE'RE SERIOUS ABOUT SAFETY.



**ADAPTIVE CRUISE CONTROL – ADVANCED.**
This available feature on Premier can automatically adapt your cruise control speed in order to maintain a driver-selected following gap to vehicles detected ahead while you steer.



**AVAILABLE FRONT PEDESTRIAN BRAKING.** At speeds up to 50 mph, a forward-looking camera surveys the road ahead, flashing a warning signal and a series of eight beeps when the vehicle is approaching a pedestrian ahead too fast. If necessary, the available system can even automatically apply last-second braking.



**FORWARD AUTOMATIC BRAKING.**
Available on Premier, radar-based Forward Automatic Braking can help mitigate collisions or even prevent them at very low speeds. If the system detects an imminent front-end collision with a detected vehicle, it alerts you and can automatically apply the brakes if you have not already done so.



**LOW SPEED FORWARD AUTOMATIC BRAKING.** Available on LT, Hybrid and Premier, camera-based Low Speed Forward Automatic Braking can help prevent or mitigate front-end collisions with detected vehicles at speeds below 50 mph.

123.   GM also promoted the "longevity" of their vehicles' brakes while failing to disclose the Brake Defect and warning consumers that the brakes could fail in their vehicles.[53]

---

[53]Exhibit M – N.

*2. INCREASED LONGEVITY.* Every Malibu has 4-wheel disc brakes with Duralife™ brake rotors — which increase the service life — and 4-channel ABS for straighter, more controlled braking.

124.   In its 2017-2019 sales brochures, GM also advertised the performance of the engines in Class Vehicles as "exhilarating" and "efficient" while knowingly omitting that the Brake Defect can cause those same engines to fail at any time.[54]

*2.0L TURBO ENGINE.* Those who crave exhilaration will not be disappointed. Try a 2.0L turbo engine with 250 horsepower and 260 lb.-ft. of torque and a new 9-speed automatic transmission for quick, seamless shifting. Both are standard on Premier. Those numbers are sure to push you back in your seat and put a smile on your face. And while performance is the first thing you'll notice, an EPA-estimated 33 MPG highway[1] is bound to keep your attention.

*1.5L TURBO ENGINE.* Powerfully efficient is the perfect way to describe this engine. Paired with a smooth-shifting 6-speed automatic transmission, this 1.5L turbo engine offers 163 horsepower, 184 lb.-ft. of torque and the kind of driving experience and performance you may not expect. It's not just exhilarating, it's also efficient, offering an EPA-estimated 36 MPG highway.[2]

---

[54] *See* Exhibits M-O.

48

125.   GM made similar statements regarding the performance, efficiency, and safety of the Class Vehicles in its 2020-2022 sales brochures.[55]

126.   Despite GM pervasively marketing the Class Vehicles as safe, efficient, reliable vehicles, GM failed to disclose, and actively conceals, the Brake Defect and the severe safety risks it poses.

127.   In practice, the Class Vehicles are not as robust and capable as GM represents. GM omitted and concealed the fact that the Class Vehicles are susceptible to reduced braking capability, brake failure, and engine damage, under normal use conditions.

128.   Plaintiff and the other Class members were exposed to GM's long-term, national, multimedia marketing campaign touting the supposed quality, safety, and reliability of the Class Vehicles; and Plaintiff and the other Class members justifiably made their decisions to purchase or lease their Class Vehicles based on GM's misleading marketing that omitted and concealed the true, defective nature of the Class Vehicles.

129.   Further, GM knowingly misled Class members about the true, defective nature of the Class Vehicles. As detailed above, upon information and belief, GM has been aware of the Brake Defect since at least 2016, and certainly

---

[55] *See generally* Exhibits P – R.

well before Plaintiff and the other Class members purchased or leased their Class Vehicles, through pre-release evaluation and testing; complaints about the Brake Defect collected by NHTSA, and/or posted on public online vehicle owner forums; its own investigations of brake failures in the Class Vehicles; repair and replacement part sales data; aggregate data from authorized-GM dealerships; and similarly reported issues of brake failure in other GM-brand vehicles put GM on notice of the Brake Defect.

130.   GM has actively concealed the existence and nature of the Brake Defect from Class members since at least 2016 despite its knowledge of the existence and pervasiveness of the Brake Defect. Specifically, GM has:

a.     Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Brake Defect;

b.     Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles' braking systems, including the cam-driven vacuum pumps and other components, were defective and not fit for their intended purposes;

c.     Failed to disclose, and actively concealed, the fact that the Class Vehicles' braking systems, including the cam-driven vacuum pumps and other components were defective, despite that GM learned of the Brake Defect

as early as 2016, and certainly well before Plaintiff and the other Class members purchased or leased their Class Vehicles; and

  d.  Failed to disclose, and actively concealed, the existence and pervasiveness of the Brake Defect even when directly asked about it by Class members during communications with GM, authorized GM-branded dealerships, and GM service centers.

131. By engaging in the conduct described above, GM has concealed, and continues to conceal, the Brake Defect from Plaintiff and the other Class members. If Plaintiff and the other Class members had known of the information GM concealed, they would not have purchased or leased the Class Vehicles, would have paid less to do so.

132. GM had notice of the Brake Defect based on its actual and exclusive knowledge, as alleged herein.

133. GM was further put on notice of the Brake Defect through numerous complaints filed against it directly and through its dealers, TSBs that GM issued related to vacuum and camshaft failure, its own investigations into brake failures in the Class Vehicles, as well as its own internal engineering knowledge. GM has not remedied its breach.

**D.    Agency Relationship Between GM and GM Dealerships.**

134.    Upon information and belief, GM has impliedly or expressly acknowledged that GM-authorized dealerships are its sales agents, the dealers have accepted that undertaking, GM has the ability to control authorized GM dealers, and GM acts as the principal in that relationship, as is shown by the following:

 i.  GM can terminate the relationship with its dealers at will;

 ii.  The relationships are indefinite;

 iii.  GM is in the business of selling vehicles as are its dealers;

 iv.  GM provides tools and resources to help GM dealers sell vehicles;

 v.  GM supervises its dealers regularly;

 vi.  Without GM, the relevant GM dealers would not exist;

 vii.  GM requires the following of its dealers:

   1.  Reporting of sales;

   2.  Computer network connection with GM;

   3.  Training of dealers' sales and technical personnel;

   4.  Use of GM-supplied computer software;

   5.  Participation in GM's training programs;

   6.  Establishment and maintenance of service departments in GM dealerships;

7.      Certification of GM pre-owned vehicles;

8.      Reporting to GM with respect to the car delivery, including reporting Plaintiff's and Class members' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9.      Displaying GM logos on signs, literature, products, and brochures within GM dealerships.

viii.      Dealerships bind GM with respect to:

1.      Warranty repairs on the vehicles the dealers sell; and

2.      Issuing service contracts administered by GM.

ix.      GM further exercises control over its dealers with respect to:

1.      Financial incentives given to GM dealer employees;

2.      Locations of dealers;

3.      Testing and certification of dealership personnel to ensure compliance with GM's policies and procedures; and

4.      Customer satisfaction surveys, pursuant to which GM allocates the number of GM cars to each dealer, thereby directly controlling dealership profits.

x.      GM dealers sell GM vehicles on GM's behalf, pursuant to a "floor plan," and GM does not receive payment for its cars until the dealerships sell them.

xi.     Dealerships bear GM's brand names, use GM's logos in advertising and on warranty repair orders, post GM-branded signs for the public to see, and enjoy a franchise to sell GM's products, including the Class Vehicles.

xii.    GM requires GM dealers to follow the rules and policies of GM in conducting all aspects of dealer business, including the delivery of GM's warranties described above, and the servicing of defective vehicles such as the Class Vehicles.

xiii.   GM requires its dealers to post GM's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized GM dealers and servicing outlets for GM cars.

xiv.    GM requires its dealers to use service and repair forms containing GM's brand names and logos.

xv.     GM requires GM dealers to perform GM's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by GM.

xvi.    GM requires GM dealers to use parts and tools either provided by GM, or approved by GM, and to inform GM when dealers discover that unauthorized parts have been installed on one of GM's vehicles.

xvii.   GM requires dealers' service and repair employees to be trained by GM in the methods of repair of GM-brand vehicles.

xviii.  GM audits GM dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.    GM requires its dealers to provide GM with monthly statements and records pertaining, in part, to dealers' sales and servicing of GM vehicles.

xx.     GM provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi.    GM provides its dealers with specially trained service and repair consultants with whom dealers are required by GM to consult when dealers are unable to correct a vehicle defect on their own.

xxii.    GM requires GM vehicle owners to go to authorized GM dealers to obtain servicing under GM warranties.

xxiii.    GM dealers are required to notify GM whenever a car is sold or put into warranty service.

## E.    GM's Warranties

135.    For the Class Vehicles, GM provides a 3 year/36,000-mile Bumper-to-Bumper Limited Warranty and a 5 year/60,000-mile Powertrain Limited Warranty.[56] Under the Bumper-to-Bumper Limited Warranty, GM agreed to repair defects reported on the Class Vehicles within the earlier of 3 years or 36,000 miles. Under the Powertrain Limited Warranty, GM agreed to cover the cost of all parts and labor needed to repair powertrain components for a period of 5 years or 60,000 miles, whichever occurs first.

136.    GM instructs vehicle owners and lessees to bring their vehicles to a certified dealership for warranty repairs. Many owners and lessees have presented Class Vehicles to GM-certified dealerships with complaints related to the Brake Defect.

---

[56] Exhibit S.

137.    GM has evaded its warranty obligations by (1) failing to tell consumers that the Class Vehicles are defective and (2) failing to provide a timely and adequate repair to correct the Brake Defect.

138.    If/when GM repaired vehicles, it has simply replaced one defective part with another defective part. This is evident by Plaintiff's and the other Class members' repeated vacuum pump failures and repairs.

139.    GM had notice of the Brake Defect based on its actual and exclusive knowledge, as alleged herein.

140.    Moreover, GM's failure to cure the Brake Defect makes any notice requirement futile.

## V.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Tolling

141.    Beginning in 2016, GM continuously marketed and sold the Class Vehicles equipped with the defective vacuum pumps to unsuspecting customers. GM continuously represented the Class Vehicles as being safe and dependable, despite the unreasonable risk of brake/engine failure and the propensity for them to fail under normal operating conditions.  By making these false representations and failing to disclose the existence of the Brake Defect in the Class Vehicles and thereby exposing occupants to risk of injury and death, GM engaged in a continuing wrong

sufficient to render inapplicable any statute of limitations that they might seek to apply.

142.   Pursuant to the TREAD Act, 49 U.S.C. § 30118, manufacturers are required to report information regarding customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects.  GM owed a continuing duty to Plaintiff and the other Class members to disclose any risks of injury or harm that its products pose.  GM continually breached that duty.

143.   GM breached its duties to consumers by knowingly selling Class Vehicles with the defective vacuum pumps on an ongoing basis.

144.   GM's knowledge of the Brake Defect is evidenced by numerous NHTSA complaints by consumers, many of whom reported contacting GM directly about the defective vacuum pumps. Other NHTSA complainants reported taking their vehicles to GM's dealers, who are agents of GM and, on information and belief, report consumer complaints back to GM.

145.   Thus, GM had continuing knowledge of the Brake Defect and the dangers it posed, yet continued to market, sell and lease the Class Vehicles equipped with the defective vacuum pumps. Plaintiff's and the other Class members' claims are not time barred.

146.   GM had a duty to disclose to Plaintiff and the other Class members the true quality and nature of the Class Vehicles, that the Class Vehicles had uniform defect; and that the Brake Defect requires repairs, poses a safety risk, and diminishes the value of the affected vehicles.

147.   This duty arose, inter alia, under the TREAD Act, 49 U.S.C. § 30118.

148.   GM knew, or was reckless or negligent in not knowing that the Class Vehicles contain the Brake Defect, as alleged herein.

149.   GM concealed and failed to disclose the Brake Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

150.   Despite GM's knowledge of the Brake Defect, it failed to disclose and concealed this material information from Plaintiff and the other Class members, and instead continued to market the Class Vehicles as safe, reliable, and fit for their ordinary purpose and intended use.

151.   Plaintiff and the other Class members justifiably relied on GM to disclose the existence of dangerous defects, including the Brake Defect, in the Class Vehicles that they purchased or leased, because that defect was not discoverable by Plaintiff and the other Class members through reasonable efforts.

152.   Any applicable statute of limitations has been tolled by virtue of GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior was ongoing.

153.   Even through the exercise of reasonable diligence, Plaintiff and the other Class members could not have discovered that GM was concealing and misrepresenting the existence of the Brake Defect in the Class Vehicles and the risks it posed.

154.   Plaintiff and the other Class members could not have reasonably discovered and could not have known of facts that would have caused a reasonable person to suspect, that GM failed to disclose material information within its knowledge about a dangerous defect to consumers worldwide.

**B.   Discovery Rule Tolling**

155.   Because GM knowledge and concealment of the Brake Defect herein act to toll any applicable statute(s) of limitations. Plaintiff and the other Class members had no way of knowing and could not have reasonably discovered the true nature of the Brake Defect in the Class Vehicles or GM's concealment of the conduct alleged herein.

156.   GM had, and continues to have, a duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the Class Vehicles, including the facts that the Class Vehicles require costly repairs, are unsafe, and have

a diminished value. As a result of GM's active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## C. Fraudulent Omission/Concealment Tolling

157. Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at GM responsible for making false and misleading statements regarding the Class Vehicles. GM necessarily is in possession of all this information. Plaintiff's claims arise out of GM's fraudulent omission/concealment of the Brake Defect, despite its representations about the Class Vehicles.

158. Plaintiff alleges that at all relevant times, including specifically at the time Plaintiff and the other Class members purchased or leased their Class Vehicle, GM knew, or was reckless in not knowing, of the Brake Defect; GM had a duty to disclose the Brake Defect to Plaintiff and Consumers; and despite its extensive and exclusive knowledge GM never disclosed the Brake Defect to Plaintiff or the public at any time or place or in any manner other than an inadequate Recall. Thus, all applicable statutes of limitation have also been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

159.    GM conducted pre-sale testing of vehicles and learned critical information related to the failure modes, as alleged herein. However, GM withheld that information from Plaintiff and the public.

**D.    Estoppel**

158.    GM was under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the Brake Defect in the Class Vehicles.

159.    GM knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the Brake Defect in the Class Vehicles.

160.    Based on the foregoing, GM is estopped from relying on any statutes of limitations in defense of this action.

## VI.    CLASS ACTION ALLEGATIONS

161.    Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following classes:

**The Nationwide Class:**    All persons or entities who purchased or leased a Class Vehicle.

**The Virginia Class:**    All persons or entities who purchases or leased a Class Vehicle in the State of Virginia.

162.   Excluded from each Class are individuals who have personal injury claims resulting from the Brake Defect caused by the Class Vehicles. Also excluded from the Class are GM and its subsidiaries, affiliates, officers, directors; persons or entities that purchased the Class Vehicles for resale; all persons who make a timely election to be excluded from the Class; the judge(s) assigned to this case and his/her immediate family; and Plaintiff's Counsel. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

163.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

164.   **Numerosity.** Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder is impracticable. GM sold hundreds of thousands of Class Vehicles across the United States. The precise number and identity of Class members can be obtained through business records regularly maintained by GM, its employees and agents, and state agencies. Class members can be notified of the pending action by electronic mail, U.S. mail, published notice, or other Court-approved notice methods.

165.   **Commonality and Predominance:** Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves questions of law and fact common to the

Class, which predominate over any questions affecting individual Class members, including, without limitation:

i.      Whether GM engaged in the conduct alleged herein;

ii.     Whether GM's alleged conduct violates applicable law;

iii.    Whether the Brake Defect creates an unreasonable safety risk in the Class Vehicles;

iv.     When GM learned of the Brake Defect;

v.      Whether GM had actual or implied knowledge of the Brake Defect;

vi.     Whether GM failed to disclose the Brake Defect to Plaintiff and the other Class members;

vii.    Whether GM designed, tested, manufactured, marketed, distributed, sold, and leased the Class Vehicles with defective vacuum pumps;

viii.   Whether GM's conduct renders it liable for breach of the implied warranty of merchantability;

ix.     Whether GM made false or misleading statements about the quality, safety and characteristics of the Class Vehicles;

x.      Whether GM concealed/omitted the Brake Defect from consumers;

xi.      Whether GM has been unjustly enriched by its deceptive conduct;

xii.      Whether Plaintiff and the other Class members have been harmed by the fraud alleged herein;

xiii.      Whether Plaintiff and the other Class members overpaid for their vehicles; and

xiv.      Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

xv.      Whether Plaintiff and other Class members are entitled to equitable relief in the form of rescission of the purchase agreement or other injunctive relief and, if so, in what amount.

166.  **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the claims of each member of the Class. Plaintiff and the other Class members sustained similar or identical damages as a result of GM's conduct as alleged herein.

167.  **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Class members she seeks to represent. Plaintiff will fairly and adequately represent and protect the interests of the Class members and has retained counsel who are experience and competent trial lawyers in complex litigation and class

action litigation. There are no material conflicts between Plaintiff's claims and those of Class members that would make class certification inappropriate. Plaintiff's counsel intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and their counsel.

168. **Superiority**: Federal Rule of Civil Procedure 23(b)(3): This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM and effectively redress the wrongs done to them. Individual litigation of each Class members' claims would be impracticable. Even if Class members could afford individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties and the court system and presents a potential for inconsistent or contradictory judgments and. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

169. **Issues Class:** Alternatively, Plaintiff seeks certification pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the above defined classes for some or all of the issues identified in the commonality and predominance section, above, as well as other issues which may be later identified.

## VII. CLAIMS ALLEGED

### COUNT I
### VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)
### (Individually and on behalf of the Nationwide Class or, alternatively, the Virginia Class)

170. Plaintiff incorporates by reference paragraphs 1-169, as if fully set forth herein.

171. Plaintiff brings this claim individually and on behalf of the Nationwide Class, or, alternatively, the Virginia Class.

172. Plaintiff and the other Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

173. GM is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5).

174. The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

175. GM's Limited Warranty is a "written warranties" within the meaning of 15 U.S.C. § 2301(6).

176.   Pursuant to VA. Code Ann. §§ 8.2-314 and 8.2A-212, GM impliedly warranted that the Class Vehicles were of a merchantable quality in the sale and lease of the Class Vehicles. This warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

177.   GM breached its warranties to Plaintiff and the other Class members by:

a)   selling and leasing the Class Vehicles that were not of a merchantable quality;

b)   selling and leasing Class Vehicles with braking systems that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

c)   refusing and/or failing to honor its warranties by repairing or replacing, free of charge, the braking system or any of its component parts in order to remedy the Brake Defect.

178.   Plaintiff and the other Class members relied on the existence and length of the warranties in deciding whether to purchase or lease the Class Vehicles.

179.   GM's breach of its warranties has deprived Plaintiff and the other Class members of the benefit of their bargain.

180.   The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.000. In addition, the amount in controversy of

Plaintiff's and the Class members' claims meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

181. GM has been afforded a reasonable opportunity to cure its breach of its warranties and/or Plaintiff and the other Class members were not required to do so because affording GM a reasonable opportunity to cure its breach of its warranties would have been futile. GM was also on notice of the alleged defect from the complaints and service requests it received from Class members, as well as from its own warranty claims, customer complaint data, and/or parts sales data.

182. As a direct and proximate cause of GM's breach of its warranties, Plaintiff and the other Class members sustained damages and other losses in an amount to be determined at trial. GM's conduct damaged Plaintiff and the other Class members, who are entitled to recover their actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

## COUNT II
## VIOLATIONS OF VIRGINIA'S CONSUMER PROTECTION ACT
### (VA. CODE ANN. § 59.1-196, *et seq*.)
### (Individually and on behalf of the Virginia Class)

183. Plaintiff incorporates by reference paragraphs 1-169 as if fully set forth herein.

184.   Plaintiff brings this claim individually and on behalf of the other members of the Virginia Class (the "Class," for purposes of this Count).

185.   The Virginia Consumer Protection Act, § 59.1-196, *et seq.*, prohibits deceptive acts or practices in the conduct of any business, trade, or commerce in Virginia.

186.   Defendant, Plaintiff, and the other Class members are "persons" within the meaning of VA. Code § 59.1-198.

187.   Defendant is a "supplier," as defined by VA. Code. Ann. § 59.1-198.

188.   The transaction between Plaintiff and the other Class members on the one hand and Defendant on the other, leading to the purchase or lease of the Class Vehicles by Plaintiff and the other Class members, are "consumer transactions" as defined by Va. Code Ann. § 59.1-1.98, because the Class Vehicles were purchased or leased primarily for personal, family or household purposes.

189.   The Virginia Consumer Protection Act ("Virginia CPA") prohibits the following fraudulent acts or practices committed by a supplier with a consumer transaction: "(5) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (6) misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; … (8) advertising goods or services with intent not to sell them as advertised; … [and] (14)

70

using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]" Va. Code Ann. § 59.1-200(A).

190.  Defendant's conduct violates the Virginia CPA because Defendant engaged in the deceptive acts and practices described in this Complaint.

191.  Defendant's deceptive conduct and its false and misleading statements about Class Vehicle and brake safety and dependability and omissions regarding the Brake Defect, which causes the vacuum pump to prematurely fail, are facts that a reasonable person would have considered material in deciding whether or not to purchase or lease (or how much they were willing to pay to purchase or lease) the Class Vehicles.

192.  Defendant's acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and the other Class members.

193.  Plaintiff and the other Class members justifiably acted or relied to their detriment upon Defendant's misrepresentations and omissions of fact, as evidenced by Plaintiff and the other Class members' leasing and purchasing of Class Vehicles.

194.  Defendant's materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and the other Class members.

71

195.  GM intended for Plaintiff and the other Class members to rely on GM's omissions regarding the Brake Defect.

196.  Plaintiff and the other Class members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described Brake Defect, as evidenced by Plaintiff and the other Class members' purchases/leases of Class Vehicles.

197.  Had Defendant disclosed all material information regarding the Brake Defect to Plaintiff and the other Class Members, Plaintiff and the other Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

198.  Defendant's deceptive acts and practices, and/or misrepresentations and omissions, have deceived Plaintiff and the other Class members.

199.  Defendant also engaged in deceptive conduct by manufacturing and placing in the stream of commerce a Class Vehicle with a braking system it knew, or should have known, was materially defective.

200.  Defendant's actions impact the public interest because Plaintiff and the other Class members have been injured in exactly the same way as thousands of other consumers by Defendant's deceptive acts and practices as described herein.

201.  As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and

actual damages. Plaintiff and the other Class members would not have purchased or leased the Class Vehicles or would have paid less for them had Defendant disclosed the truth about the Brake Defect. Plaintiff and the other Class members also suffered diminished value of their vehicles.

202.  As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff and the other Class members were harmed by GM's failure to recall the Class Vehicles, described above, including Defendant's failure to notify them of the Brake Defect, failure to direct them to stop driving their Class Vehicles, and failure to offer Class members a free loaner vehicle of comparable make, model, or value as their Class Vehicles until Defendant is able to devise a remedy that that is safe and dependable  (if ever) and implement it in each Class Vehicle. Defendant's failure to do so continues to expose Plaintiff and the other Class members to the risk of injury and death.

203.  Defendant's violation of the Virginia CPA was willful and knowing. Defendant knowingly and willfully marketed the Class Vehicles as safe and dependable all the while knowing they were not. Defendant, through its willful and knowing deceptive acts and practices, as detailed above, has willfully and knowingly exposed Plaintiff and the other Class members to the risk of serious injury and death, and continues to do so.

204.    Pursuant to Va. Code Ann. § 59.1-204, Plaintiff, individually and on behalf of the other Class Members, seeks monetary relief against Defendant measured as the greater of: (a) actual damages in an amount to be determined at trial; and (b) statutory penalties in the amount of $500 for Plaintiff and each of the other Class members.

205.    Because Defendant's conduct was committed willfully and knowingly, Plaintiff and the other Class members are entitled to recover the greater of: (a) three times actual damages; or (b) $1,000.

206.    Plaintiff also seeks an order enjoining Defendant's fraudulent, unfair, and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the Virginia General Business Law § 59.1-203, *et seq.*

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(VA. CODE ANN. § 8.2-314)**
**(Individually and on behalf of the Virginia Class)**

207.    Plaintiff incorporates by reference paragraphs 1-169 as if fully set forth herein.

208.    Plaintiff brings this Count individually and on behalf of the other members of the Virginia Class (the "Class," for purposes of this Count).

209.    GM is, and was at all relevant times, a "merchant" with respect to motor vehicles under Va. Code Ann. § 8.2-314, and a "seller" of the Class Vehicles under

§ 8.2-103(1)(d).  The Class Vehicles are "goods" as defined in Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

210.  Pursuant to VA. Code Ann. §§ 8.2-314 and 8.2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law in the sale or lease of the product.  GM impliedly warranted that the Class Vehicles were of a merchantable quality.

211.  By placing the Class Vehicles in the stream of commerce, GM impliedly warranted that the Class Vehicles are safe, and that all claims in their advertising and marketing of the Class Vehicles were true.

212.  The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles' braking systems are prone to sudden failure and pose an unreasonable risk to occupant safety due to the Brake Defect. The Brake Defect is present in all Class Vehicles and causes an unreasonable risk of death and/or serious bodily harm to lessees and owners of the Class vehicles as well as passengers and other drivers on the road.

213.   The Brake Defect renders the Class Vehicles unmerchantable and unfit for their ordinary purpose of driving, at the time the Class Vehicles were sold/leased and at all times thereafter.

214.   Plaintiff and the other Class members were and are third-party beneficiaries to GM's contracts with GM-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and the other Class members.

215.   Further, GM has refused to provide an adequate warranty repair for the Brake Defect, thus rendering the satisfaction of any requirement futile. Unless GM remedies the Brake Defect within the requisite time-period, Plaintiff, individually and on behalf of the other Class members, will seek all damages and relief to which they are entitled.

216.   Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and GM's breach of the warranty of merchantability.

217.   At all times that GM warranted and sold the Class Vehicles, it knew or should have known that its warranties were false, and yet GM did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and, instead, continued to issue false warranties, and continued to insist that the Class Vehicles were safe. The Class Vehicles were defective when GM delivered them to its resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore

still defective when Plaintiff and the other Class members purchased or leased their Class Vehicles.

218.   GM's resellers, dealers, and distributors are intermediaries between GM and consumers.  These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against GM with respect to Plaintiff's and the other Class Members' acquisition of Class Vehicles. GM's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

219.   Plaintiff's and the other Class members' acquisition of the Class Vehicles suffices to create privity of contract between Plaintiff and the other Class members, on the one hand, and GM, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and their resellers, authorized dealers, and, specifically, of GM's implied warranties.

220.   GM had notice of its breach as alleged herein.

221.   As a direct and proximate result of GM's breach of implied warranties of merchantability, Plaintiff and the other Class members are entitled to recover damages in an amount to be determined at trial.

**COUNT IV**
**BREACH OF EXPRESS WARRANTY**
**(VA. CODE §§ 8.2-313 and 8.2A-210)**
**(Individually and on behalf of the Virginia Class)**

222.   Plaintiff incorporates by reference paragraphs 1-169, as if fully set forth herein.

223.   Plaintiff brings this Count individually and on behalf of the other members of the Virginia Class (the "Class," for purposes of this Count).

224.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of the Class Vehicles under § 8.2-103(1)(d).

225.   Pursuant to Va. Code § 8.2-313(1)(a), GM had obligations to conform the Class Vehicles to its express warranties.

226.   In its written express warranties, GM expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

227.   GM's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles.

228.   GM breached its express warranty to repair defective parts in the Class Vehicles. GM has not repaired the Class Vehicles' Brake Defect.

229.   Further, GM has refused to provide an adequate warranty repair for the Brake Defect, thus rendering the satisfaction of any notice requirement futile. As

stated above, customers that have presented their vehicles for warranty repair due to Brake failure have been denied adequate repairs.

230. The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because GM has failed and/or has refused to adequately provide an effective remedy within a reasonable time.

231. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

232. Also, as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

233. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other

Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

234.   Also, as alleged in more detail herein, at the time that GM warranted and sold or leased the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class Members were therefore induced to purchase or lease the Class Vehicles under false pretenses.

235.   GM had notice of its breach as alleged herein.

236.   As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT V**
**FRAUDULENT CONCEALMENT/OMISSION**
**(Individually and on behalf of the Virginia Class)**

237.   Plaintiff incorporates by reference paragraphs 1-169, as if fully set forth herein.

238.   Plaintiff brings this Count individually and on behalf of the other members of the Virginia Class (the "Class," for purposes of this Count).

239.   GM was aware of the Brake Defect within the Class Vehicles when it marketed, sold, and leased the Class Vehicles to Plaintiff and the other Class members.

80

240.    Having been aware of the Brake Defect within the Class Vehicles, and having known that Plaintiff and the other Class members could not have reasonably been expected to know of Brake Defect, GM had a duty to disclose the Brake Defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

241.    Further, GM had a duty to disclose the Brake Defect, because disclosure of the Brake Defect was necessary to dispel misleading impressions about the Class Vehicles' reliability and safety.

242.    Specifically, GM promoted, through its advertisements available to all Class members, that the vehicles were reliable and safe. GM also disclosed information concerning the Class Vehicles' safety systems, including the braking system, in window stickers associated with the Class Vehicles, without disclosing that these systems contained an inherent defect that would be material to any purchaser or lessee.

243.    GM did not disclose the Brake Defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

244.    For the reasons set forth above, the Brake Defect comprises material information with respect to the sale or lease of the Class Vehicles.

245.   In purchasing or leasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

246.   Had Plaintiff and the other Class members known of the Brake Defect within the Class Vehicles, they would have not purchased or leased the Class Vehicles or would have paid less for the Class Vehicles.

247.   Through its omissions regarding the Brake Defect within the Class Vehicles, GM intended to induce, and did induce, Plaintiff and the other Class members to purchase or lease a Class Vehicle that they otherwise would not have purchased or leased, or to pay more for a Class Vehicle than they otherwise would have paid.

248.   As a direct and proximate result of GM's omissions, Plaintiff and the other Class members either paid too much for the Class Vehicles or would not have purchased the Class Vehicles if the Brake Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## VIII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court enter judgment in her favor and against GM, as follows:

A.  Certifying the proposed Nationwide and State Classes, appointing Plaintiff as Class Representative, and Plaintiffs' Counsel as Class Counsel;

B.  Ordering restitution, including at the election of Class members, recovery of the purchase price of their Class Vehicles, or the overpayment or diminution in value of their vehicles;

C.  Awarding damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

D.  Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

E.  An award of costs and attorneys' fees; and

F.  Such other or further relief as may be appropriate.

## IX.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: July 8, 2022                      Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Suite 300
Rochester, Michigan  48307
Telephone: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

H. Clay Barnett, III
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Overlook II
2839 Paces Ferry Road SE, Suite 400
Atlanta, Georgia  30339
Telephone: 404-751-1162
Clay.Barnett@BeasleyAllen.com

W. Daniel "Dee" Miles, III
J. Mitch Williams
Dylan T. Martin
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Mitch.Williams@Beasleyallen.com
Dylan.Martin@BeasleyAllen.com

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone:  312-214-7900

84

alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

***Counsel for Plaintiff and the Proposed
Class***